IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LIL' BROWN SMOKE SHACK,<br><br>              Plaintiff,<br><br>v.<br><br>LAWRENCE G. WASDEN, Attorney General of the State of Idaho; OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF IDAHO; RICHARD ARMSTRONG, Director of Health and Welfare; IDAHO DEPARTMENT OF HEALTH AND WELFARE; and DOES 1-10;<br><br>              Defendants. | Case No. CV 09-044-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

Currently pending before the Court is Lil' Brown Smoke Shack's Motion for Preliminary Injunction (Docket No. 10) filed on March 3, 2009. After thoroughly reviewing the briefing submitted by the parties and the record, and hearing oral argument on the motion, the Court will deny the motion as more fully explained below.

**I.
Background**

On February 5, 2009, Plaintiff Lil' Brown Smoke Shack filed a Complaint for Declaratory, Preliminary and Permanent Injunctive Relief Against Defendants From Their

Threatened Enforcement of I.C. §39-5701, et seq. (Docket No. 1). The Complaint requests the Court to declare that enforcement of the Minors' Access Act, I.C. §39-5701, et seq. ("MAA"), would violate federal law because Plaintiff is a tribally owned and licensed business located on tribal land outside of the State of Idaho. Specifically, Plaintiff argues the MAA violates the Commerce Clause, the Indian Commerce Clause, the Supremacy Clause, tribal sovereignty, and Plaintiff's treaty rights under the 1855 treaty between the Yakama Nation and the United States. (Complaint, Docket No. 1). On February 9, 2009, Defendants filed a complaint against Plaintiff in the Fourth Judicial District of the State of Idaho, in and for the County of Ada, for violations of the MAA, specifically selling tobacco products to Idaho consumers without complying with the registration and reporting obligations imposed by the MAA.[1] (Verified Complaint, Docket No. 8-3).

Plaintiff filed a Motion for Preliminary Injunction (Docket No. 10) on March 3, 2009, arguing that the State of Idaho should be enjoined from enforcing the MAA against it because Plaintiff is likely to succeed on the merits of its dormant Commerce Clause and tribal sovereignty claims, and will suffer irreparable injury if a preliminary injunction is not issued. The Court will address each of Plaintiff's arguments in turn.[2]

---

[1] The state court entered a decision on August 11, 2009, denying Lil' Brown Smoke Shack's Motion to Dismiss finding that enforcement of the MAA would not violate the dormant Commerce Clause. (Amended Notice of Decision in Related State Court Proceeding, Docket No. 41-1).

[2] The Court notes that Defendants' Memorandum in Opposition (Docket No. 23) contains argument regarding abstention under the *Younger* doctrine. As the Court fully addressed this issue in its Memorandum Decision and Order on Defendants' Motion to Dismiss (Docket No. 32), the Court will not address those arguments again here.

MEMORANDUM DECISION AND ORDER - 2

II.
Discussion

A. Legal Standard

A preliminary injunction is an extraordinary remedy never awarded as of right. *Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 365, 374 (2008) rev'g 518 F.3d 658 (9th Cir. 2008) citing Munaf v. Geren, 128 S.Ct. 2207, 2218-2219 (2008). "In order to issue a preliminary injunction, the plaintiff must established that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.*; *American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009). The mere possibility of irreparable harm in the absence of an injunction is not sufficient as such a standard would be "inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id. citing Maurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

B. Plaintiff's Likelihood of Prevailing

**1. Dormant Commerce Clause**

Plaintiff argues that the dormant Commerce Clause bars the application and enforcement of the MAA because the dormant Commerce Clause prohibits the State of Idaho from dictating what Plaintiff must do at its physical place of business located on a tribal reservation outside the state of Idaho. (Memo p. 12, Docket No. 11.)

The Commerce Clause provides that "[t]he Congress shall have Power...[t]o regulate Commerce...among the several States." Art I, §8, cl. 3. However, the Commerce Clause is more than an affirmative grant of power; it also prohibits certain state actions that unjustifiably

discriminate against or burden the interstate flow of commerce. *Oregon Waste Systems, Inc. V. Department of Environmental Quality of State of Oregon*, 511 U.S. 93, 98 (1994) (internal citations omitted). The Supreme Court of the United States has found that the Framers granted Congress plenary authority over interstate commerce in "the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relationships among the colonies and later among the States under the Articles of Confederation." *Id.* (citing *Hughes v. Oklahoma*, 441 U.S. 322, 325-326 (1979)). Thus, the purpose of the dormant Commerce Clause is to protect against inconsistent legislation arising from the projection of one state's regulatory regime into the jurisdiction of another state. *Healy v. The Beer Institute*, 491 U.S. 324, 336-337 (1989). Further, the dormant Commerce Clause is intended "to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." *S.D. Myers Inc., v City and County of San Francisco*, 253 F.3d 461, (9th Cir. 2001) (quoting *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994)).

The Supreme Court has outlined a two tiered approach to analyzing state regulations under the dormant Commerce Clause. First, if a statute directly regulates interstate commerce, discriminates against interstate commerce, or favors in-state over out-of-state interests, the statute is "virtually per se invalid." *Brown-Forman Distillers Corp v. New York State Liquor Authority*, 476 U.S. 573, 579 (1986); *Hughes*, 441 U.S. at 344, n. 6. Statutes in this category are strictly scrutinized and "the burden falls on the State to justify [the discrimination] both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hunt v. Washington State Apple*

*Advertising Com'n*, 432 U.S. 333, 353 (1977). "Direct regulation occurs when a state law directly affects transactions that take place across state lines or entirely outside the state's borders." *S.D. Myers Inc., v. City and County of San Francisco*, 253 F.3d 461, (9th Cir. 2001). The practical effect of a challenged statute is the critical inquiry when determining whether that statute constitutes direct regulation. *Id*. (citing *Healy*, 491 U.S. 324). In analyzing the practical effect of the statute, the court must consider the consequences of the statute itself and how the statute may interact with legitimate regulatory regimes of other states. *Id.* (citing *Healy*, 491 U.S. at 336).

However, if the regulation is non-discriminatory and has only incidental or indirect effects on interstate commerce, it must be analyzed under the second tier of the dormant Commerce Clause test. These regulations are valid unless "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc*, 397 U.S. 137, 142 (1970); *see also Alaska Airlines, Inc v. City of Long Beach*, 951 F.2d 977, 983 (9th Cir. 1991) ("For a facially neutral statute to violate the Commerce Clause, the burdens of the statute must so outweigh the putative benefits as to make the statute unreasonable or irrational."). "If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated depends on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id. at* 143. However, the burdens on interstate commerce will outweigh the benefits if the "asserted benefits are in fact illusory." *Alaska Airlines*, 951 F.2d at 983.

This balancing test under the second tier analysis does not, however, invite courts to "'second guess the empirical judgments of lawmakers concerning the utility of the legislation.'"

*CTS Corp. v. Dynamics Corp. Of Am.,* 481 US 69, 92 (1987) (quoting *Kassel v. Consol. Freightways Corp.,* 450 U.S. 662, 669 (1981)). Additionally, it is not the function of the court to decide whether in fact the regulation promotes its intended purpose, so long as an examination of the evidence before or available to the lawmakers indicated that the regulation is not wholly irrational in light of its purposes. *Kassel*, 450 U.S. at 680-1.

### a. First Tier Analysis

Plaintiff argues that the MAA violates the dormant Commerce Clause because it has the practical effect of controlling commerce occurring entirely outside the State of Idaho. Specifically, Plaintiff contends the following five provisions of the MAA violate the dormant Commerce Clause: 1) requiring businesses like Plaintiff, with a physical location outside of Idaho, to have a permit; 2) requiring employers outside of the State of Idaho to train their employees regarding the MAA; 3) tax collection requirements; 4) regulating website content; and 5) requiring that the permitted locations, including those outside the State of Idaho, be inspected.[3] Plaintiff argues that these provisions regulate activity occurring wholly outside the State of Idaho, invalidating the MAA.

Defendants argue that the MAA does not regulate commerce occurring wholly outside the State of Idaho, because the MAA seeks to regulate only the retail sale of tobacco products that are purchased by and shipped to consumers in Idaho. Further, Defendants draw a distinction

---

[3] The Court notes that the MAA is severable pursuant to its terms. I.C. § 39-5712. Thus, each provision may be examined alone to determine whether it may violate the dormant Commerce Clause. This is consistent with the principle that "a court should refrain from invalidating more of a statute than is necessary." *The National Collegiate Athletic Ass'n v. Miller*, 10 F.3d 633, 640 (9th Cir. 1993) (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984)). If severable provisions are found to be unconstitutional, a court reviewing the statute should maintain the statute in so far as it is valid. *Id*. (citing *Alaska Airlines, Inc v. Brock*, 480 U.S. 678, 684 (1987)).

between cases where the court has found a dormant Commerce Clause violation and the current situation. As more fully explained below, the Court agrees that upon applying the first tier of the analysis, Plaintiff is not likely to succeed on its dormant Commerce Clause challenge.

In *Healy*, the United States Supreme Court found that the Connecticut Liquor Control Act violated the Commerce Clause because the Act's pricing provisions operated to control the prices at which out-of-state shippers could sell beer in other states. *Healy*, 491 U.S. 324. Thus, the Act had the "undeniable effect of controlling commercial activity occurring wholly outside the boundary of the State." *Id. at* 337.

Similarly, in *NCAA v. Miller,* the Ninth Circuit held that a Nevada statute applying due process requirements to a regional athletic association's enforcement proceedings violated the dormant Commerce Clause. *NCAA v. Miller*, 10 F.3d 633 (9th Cir. 1993). The Ninth Circuit held that, in light of the NCAA policy to have uniform enforcement procedures, enacting the Nevada statute would have the practical effect of requiring the NCAA to "regulate the integrity of its product in every state according to Nevada's procedural rules." *Id. at* 639. Therefore, the practical effect of the Nevada statute was to regulate enforcement proceedings occurring wholly outside of the State of Nevada. *Id*. Further, the Ninth Circuit held that the existence of similar regulation in other states supported the finding of a Commerce Clause violation. *Id*. The Ninth Circuit stated: "[t]he serious risk of inconsistent obligations wrought by the extraterritorial effect of the Statute demonstrates why it constitutes a per se violation of the Commerce Clause." *Id. at* 640.

The Court agrees with Defendants that *Healy* and *NCAA* differ from the situation before the Court. Here, it is not clear that the MAA regulates commerce occurring wholly outside of

the State of Idaho. The MAA does not regulate the terms of tobacco sales and transactions Plaintiff has with other states, does not appear to effect the transactions Plaintiff undertakes with other states, and does not regulate any other commerce that is not tied to the Plaintiff's sales of tobacco products to Idaho consumers.[4] The Court does acknowledge that the MAA would regulate certain aspects of Plaintiff's business activities that occur out-of -state, <u>after</u> Plaintiff has chosen to subject itself to the MAA by selling tobacco products to Idaho consumers. However, based on the jurisprudence referenced above, it is not clear at this stage of the proceedings that these regulations included in the MAA constitute a dormant Commerce Clause violation.[5]

Further, Plaintiff also contends that the MAA violates the dormant Commerce Clause because, if every state adopted its own version of the MAA, a conflicting regulatory burden "impossible for it to comply with" would be created. (Memo In Support p. 18, Docket No. 11). Although an appropriate inquiry, it is insufficient for the Plaintiff to speculate about conflicting regulation. Plaintiff must either present evidence that conflicting legislation is already in place or that the threat of such legislation is both actual and imminent. *S.D. Myers*, 253 F.3d at 470

---

[4] In *S.D. Myers*, the Ninth Circuit noted, when holding that the ordinance did not violate the dormant Commerce Clause, that "the Ordinance will affect an out-of-state entity only after that entity has affirmatively chosen to subject itself to the Ordinance by contracting with the City." 253 F.3d at 469.

[5] Further, with respect to the internet requirements, the Court finds that the practical effect is not the direct control of commerce wholly outside Idaho. Instead, the website regulations directly regulate website advertising that is targeted only at Idaho consumers. *See People ex. Rel. Brown v. Puritec*, 153 Cal. App.4th 1524 (Ca. App. 2007) ("if sellers of water treatment devices decide to conform all of their website advertising to California law, that is a voluntary business decision, not a mandatory legal one").

Additionally, the Court finds it is unclear what tax provisions, if any, apply to Plaintiff. Therefore, the Court at this stage finds a preliminary injunction inappropriate.

MEMORANDUM DECISION AND ORDER - 8

(citing *Huron Portland Cement Co v. City of Detroit*, 362 U.S. 550, 448 (1960)). As noted by the Ninth Circuit, "the Supreme Court has never invalidated a state or local law under the dormant Commerce Clause based upon the mere speculation about the possibility of conflicting legislation." *S.D Myers, Inc.*, 253 F.3d at 470. Thus, the Court finds that, because Plaintiff has not presented any actual conflicting regulations or an imminent threat of such legislation to the Court, the issuance of a preliminary injunction is not warranted under the first tier analysis of Plaintiff's dormant Commerce Clause challenge.

### b. Second Tier Analysis

Turning to the second tier of the analysis, Defendants argue that the MAA should be evaluated under the *Pike* balancing test to the extent the MAA is non-discriminatory and applies evenhandedly to both in-state and out-of-state tobacco retailers selling tobacco products to consumers located inside the State of Idaho. Plaintiff does not dispute the non-discriminatory nature of the MAA, and the Court agrees that the *Pike* balancing test may be applicable.

When applying the *Pike* balancing test, the Court finds that the State of Idaho has a legitimate interest in preventing minors' access to tobacco. This was conceded by Plaintiff during oral argument and also is supported by the United States Supreme Court's decision in *Austin v. Tennessee,* finding that the states have a legitimate interest in regulating the sale of cigarettes. 179 U.S. 343, 348-349 (1900). Thus, the focus of the second tier of the dormant Commerce Clause analysis is whether the MAA is overly burdensome on interstate commerce in light of the important state interest it protects.

Defendants argue that the MAA is not overly burdensome. In support of their argument, Defendants cite cases they contend upheld more rigorous restrictions on interstate commerce

than those at issue here. Specifically, Defendants cite *Brown and Williamson Tobacco Corp v. Potaki*, 320 F.2d 200 (2d Cir. 2003) and *Arkansas Tobacco Control Board v. Santa Fe Natural Tobacco Co.*, 199 S.W.3d 656 (Ark. 2004). In both cases, the courts upheld state statutes requiring tobacco retailers to have a physical retail location in the state in which they were transacting tobacco sales. In *Brown & Williamson*, the Second Circuit upheld a New York statute that prohibited cigarette retailers from shipping cigarettes directly to New York consumers. The Second Circuit found that, even if the practical effect of the statute was to price out-of-state direct shippers out of the New York market by forcing them to establish a retail location, the statute did not violate the Commerce Clause because both in-state direct shippers and out-of-state direct shippers were held to the same standard. *Brown & Williamson*, 320 F.3d at 212.[6] The court in *Santa Fe* upheld an Arkansas law requiring all cigarette retailers to have a physical location in the State of Arkansas for the same reasons articulated in *Brown & Williamson*.[7]

Plaintiff distinguishes these cases on the grounds that they addressed the state's regulatory power to prohibit or require certain conduct within its borders and neither involved a claim that the state was attempting to regulate conduct occurring entirely outside of its borders. (Reply p. 5, Docket No. 25). The Court agrees with Plaintiff that there may be a distinction, especially with respect to the provisions of the MAA that require actions or activities outside the

---

[6] Interestingly, the New York statute at issue in *Brown & Williamson*, included an exclusion for cigarettes sold on Indian reservations to tribal members.

[7] The statute at issue in *Santa Fe* had a similar purpose to the MAA and the court held that any burden on interstate commerce by forcing cigarette retailers to have a physical location in the state was not "sufficient to outweigh the State's significant interest in limiting the sale of cigarettes to minors." *Santa Fe*, 199 S.W.3d at 666.

border of the State of Idaho. However, the Court agrees with Defendants that forcing out-of-state retailers to become in-state retailers, which was the effect of the regulations in *Brown* and *Santa Fe*, is more burdensome than simply requiring out-of-state retailers to obtain a permit prior to selling tobacco products in the state. Therefore, the Court finds that the likelihood of Plaintiff succeeding on the merits of its permit claim does not rise to the level sufficient to warrant a preliminary injunction.

However, the Court finds that the Plaintiff's likelihood of prevailing on the merits of the dormant Commerce Clause claim is less certain with respect to the portions of the MAA that potentially regulate activities on the reservation related to Plaintiff's sales of tobacco to Idaho consumers, including all regulations regarding the content of Plaintiff's website, the provision requiring inspection of the premises located on tribal land, and the prescribed training of employees located outside of the State of Idaho.[8] Although, the Court does not believe Plaintiff has demonstrated that its chances of success on the merits regarding these provisions of the MAA is likely, particularly in light of the fact that these provisions apply equally to both in-state and out-of-state retailers choosing to sell to Idaho consumers and the importance of the legitimate state interest in protecting minors from tobacco, the actual extent of the burden imposed on Plaintiff and on interstate commerce as a whole is unclear. Thus, the Court has insufficient evidence from which to conclude that Plaintiff is likely to succeed on the merits of its dormant Commerce Clause claim. Therefore, after applying the second tier analysis, the Court will deny Plaintiff's request for a preliminary injunction on its dormant Commerce Clause

---

[8] The Court agrees with Defendant that the tax provisions appear not to apply to Plaintiff because Plaintiff is not a distributor as defined by Idaho Code. Therefore, the Court finds that, at this time, Plaintiff has not demonstrated likelihood of success on the merits with respect to the tax requirements violating the dormant Commerce Clause.

MEMORANDUM DECISION AND ORDER - 11

challenge.

### 2. Tribal Sovereignty

Plaintiff argues that enforcement of the provisions of the MAA upon it would violate Plaintiff's long held tribal sovereignty rights. Specifically, Plaintiff argues that Indian tribes have historically retained significant power to: 1) govern their own internal employment practices; 2) establish their own set of business regulations to govern on-Reservation business practices; and 3) exclude anyone from the Reservation who has not been authorized to enter upon its lands. (Memo p. 21, Docket No. 11).

The Supreme Court of the United States has long recognized that "Indian tribes are 'domestic dependant nations' that exercise inherent sovereign authority over their members and territories." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509 (1991) (quoting *Cherokee Nation v. Gerogia*, 5 pet, 1, 17 (1831)). "Because of their sovereign status, tribes and their reservation lands are insulated in some respects by an 'historic immunity from state and local control.'" *New Mexico v. Mescalro Apache Tribe*, 462 U.S. 324, 332 (1983) (quoting *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152 (1973)). Further, tribes retain any aspect of their historical sovereignty "not inconsistent with the overriding interests of the National Government." *Id.* (quoting *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 153 (1980)).

Today, the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation. *Nevada v. Hicks*, 533 U.S. 353, 361 (2001). Where tribal sovereignty and state regulatory authority collide, courts must seek to reconcile the plenary power of the states over residents within their borders with the semi-

autonomous status of Indians living on tribal reservations. *Dept. Of Taxation and Finance of New York v. Milhelm Attea & Bros., Inc.,* 512 U.S. 61, 73 (1994). Resolution of these conflicts does not depend on "rigid rules;" instead, courts must undertake "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145 (1980). In making this inquiry, there is a significant geographical aspect to tribal sovereignty, "although the reservation boundary is not absolute, it remains an important factor to weigh in determining whether state authority has exceeded the permissible limits." *Bracker*, 448 U.S. at 151. Additionally, "the greater the tradition of tribal independence and self government, the more reluctant the Court is to infer that Congress has '"authorized the assertion of state authority."'" *Fort Belnap Indian Community v. Mazurek*, 43 F.3d 428, 433 (1994) (quoting *Rice v. Rehner*, 463 U.S. 713, 719 (1983)).

Generally, state law is inapplicable to on-reservation conduct involving only Indians, as the state's regulatory interest in such conduct is minimal and the federal interest in encouraging self-government is at its strongest. *Id.* However, state laws may be applied to on-reservation activity if "exceptional circumstances" exist. *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324 (1983). In contrast, Indians extending beyond reservation boundaries generally have been held subject to non-discriminatory state law otherwise applicable to all citizens of the state. *Bracker,* 448 U.S. at n.11 (*citing Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-9).

Defendants argue that the fact that Plaintiff is a tribal business located on a reservation is irrelevant. Instead, Defendants contend that Plaintiff should be treated no differently than other remote vendors because it is Plaintiff's voluntary introduction of tobacco productions into the

State of Idaho that triggers the MAA. In support of this argument, Defendants cite *Dept. of Health and Human Services v. Maybee*, 965 A.2d 55 (Me. 2009).[9] Maybee was a tobacco retailer selling products from his business location on an Indian reservation in the state of New York over the internet to consumers in Maine. The Maine Supreme Court determined that Maybee's actions as a delivery seller reached beyond the reservation "when he accepts orders from and sends cigarettes to consumers who are off the reservation." *Id*. In determining that the State of Maine had the authority to enforce the tobacco vendor licensing requirements[10] against Maybee, the court did not apply the *Bracker* and *Wagnon* balancing test. Instead, the court found that, when the activity of tribal members has an impact outside the reservation it may be regulated by the states. *Id*. at 58.

A similar result was reached in *Ward v. New York*; however, in that case the court applied the *Bracker* test to three different activities performed by the Indian retailers. 291 F.Supp.2d (W.D.N.Y. 2003). In *Ward,* tribal members operating businesses involved in the sale of

---

[9] The Idaho Supreme Court recently decided a similar case involving Mr. Maybee. *State of Idaho v. Maybee*, 2010 WL 143459 (Idaho, Jan. 15, 2010). In this case, the State of Idaho brought an action against Maybee for violating Idaho's Tobacco Master Settlement Agreement Complimentary Act and the MAA's permit requirement. Maybee argued that the permit requirement of the MAA was preempted by the Indian Commerce Clause. The Idaho Supreme Court held, after finding that the Complimentary Act did not violate the dormant Commerce Clause, that the Indian Commerce Clause did not preclude the application of the permit requirement to Maybee because the regulated conduct occurred off the reservation. *Id*. at 14.

[10] The Maine Statute includes requirements that the shipper of the tobacco products obtain certain information from the consumer, and submit a memorandum or copy of each invoice providing the name and address of the purchaser, the brand or brands purchased as well as the quantity purchased to the State of Maine regarding sales to consumers in Maine. 22 M.R.S.A. 1555-C. The United States Supreme Court has held that the provision of Maine's statute requiring licensed tobacco shipper to utilize delivery service that verified legal age of buyer was preempted by the Federal Aviation Administration Authorization Act. *Rowe v. New Hampshire Motor Transport Ass'n*, 128 S.Ct. 989 (2008).

cigarettes challenged the constitutionality of a law banning the direct shipment and transportation of cigarettes to consumers in the state.[11] The tribal members asked for a preliminary injunction enjoining New York State from enforcing the statute against them. In analyzing whether prohibiting the shipment or transportation of cigarettes by a tribal member from the reservation to a non tribal member off the reservation, the court assumed that the mail order, telephone, and internet cigarette sales by the tribal retailers occurred on the reservation. Holding that the *Colville*[12] line of cases, including *Rice v. Rehner,* was most applicable to the situation presented, the court found it clear that states may impose at least minimal burdens on tribal commerce with non tribal members to further legitimate state interests. Additionally, the

---

[11] This case challenged the same law that was upheld in *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200 (2d Cir. 2003).

[12] The court in *Ward* distinguishes between two lines of cases the *Colville* cases and the *Mescalero* cases. The *Colville* cases uphold the states authority to regulate on reservation transactions between tribal members and non tribal members includes *Moe v. Confederated Salish & Kootenai Tribes*, of 425 U.S. 463, 483 (1976) (holding that Montana could require Indian retailers on a Montana Indian reservation to collect state taxes on sales to non-Indians); *Colville*, 447 U.S. at 154-62 (holding that the State of Washington could impose cigarette and sales taxes with respect to on reservation purchases by non-tribe members; *Attea*, 512 U.S. at 75 (upholding New York regulatory scheme that imposed record-keeping requirements and quantity limitations on cigarette wholesalers who sell untaxed cigarettes to reservation Indians); *Rice v. Rehner*, 463 U.S. 713 (1983) (upholding a California law requiring an Indian trader to obtain a permit to sell liquor for consumption off the reservation. The Supreme Court stated "regulation of sales to non-Indians or nonmembers of the... Tribe simply does not 'contravene the principle of tribal self-government,' and therefore, neither [the trader] nor the ... Tribe has any special interest that militates against state regulation in this case, providing that Congress has not preempted such regulation.")
      The *Mescalero* line of cases are cases where the court stuck down the state regulations dealing with commerce between tribe members and non-tribe members, holding that these regulations violated the principles of tribal sovereignty. *Mescalero*, 462 U.S. at 331-4 (holding that New Mexico could not regulate hunting and fishing on the reservation pointing to the lack of effects outside of the reservation); *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 214-22 (1987) (holding that a California regulation of on-reservation gaming violated tribal sovereignty.)

MEMORANDUM DECISION AND ORDER - 15

court found that the state's interest in regulating cigarette sales, reducing adult consumption, and restricting minors access was significant and outweighed the tribal interests. The court noted that the state interest was particularly significant, because New York can point to off-reservation effects that necessitated state intervention.[13]

Here, Defendants argue that, if the *Bracker* balancing test applies, the permit requirement is an important state interest outweighing the tribal interests. Specifically, Defendants argue that the permit requirement allows the State of Idaho to control the ability of minors to obtain tobacco by ensuring that the Department of Health and Welfare has a central repository of all businesses marketing tobacco to Idaho residents with a uniform set of data which facilities compliance and monitoring. Defendants contend this interest outweighs the relevant tribal interests identified by Plaintiff, partially because the burden on Plaintiff in submitting annually to a no-charge permit is non existent. However, Defendants do not address Plaintiff's contention that the right to make employment decisions, business decisions, and the right to exclude persons from the reservation are longstanding tribal interests that, although they do not singularly justify non compliance with the MAA, must be balanced in the *Bracker* test particularly with respect to the other contested provisions of the MAA. The Court agrees that the *Bracker* test should be applied.

The Court finds that, even though the Plaintiff's likelihood of success on the merits with respect to the permit requirement is low, the likelihood of success with respect to the other provisions of the MAA is more plausible. However, Plaintiff has failed to clearly demonstrate that it is likely to succeed on these claims. Thus, the Motion for Preliminary Injunction on

---

[13] However, to the Court's knowledge, the statute at issue in *Ward* did not include the inspection and employment provisions that are included in the MAA.

Plaintiff's tribal sovereignty challenges will be denied.

## C. Irreparable Harm

Plaintiff argues that any violation of constitutional rights or infringement of tribal sovereignty rises to the level of irreparable harm because it cannot be remedied by monetary damages. Generally, irreparable injury is presumed where there is an alleged violation of constitutional rights. *Ward v. New York*, 291 F.Supp. at 196 (citing *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996)). Defendants respond by arguing merely that there is no irreparable injury in allowing the state court action to proceed without federal interference.

As the Court has found that Plaintiff has not clearly demonstrated it is likely to succeed on the merits of its challenges to the MAA based on the dormant Commerce Clause and tribal sovereignty, a preliminary injunction is not justified and the Court need not address the irreparable harm arguments further.

## D. State of Idaho's Jurisdiction to Enforce the MAA

Plaintiff also argues that the State of Idaho has no jurisdiction to enforce the MAA against Plaintiff because Plaintiff is a tribal business located outside of the State of Idaho. Specifically, Plaintiff points to I.C. § 67-5101 which governs the jurisdiction of the state over Indians on tribal land located within the State of Idaho. However, this provision is inapplicable here. The Court is not analyzing the extent to which the state may enforce the MAA on tribal lands within the State of Idaho. Instead, the Court is considering the validity of the State of Idaho enacting and enforcing a statute against a tobacco retailer located on a reservation outside of Idaho's boundaries. The ability of the state to enforce the MAA against Plaintiff does not rest solely upon an analysis of I.C. § 67-5101, but instead, at least partially upon whether the MAA

is valid under the dormant Commerce Clause and whether enforcement would violate Plaintiff's tribal sovereignty rights. As the Court has not reached a final decision regarding the validity of the MAA, the Court finds that ruling as to Idaho's jurisdiction to enforce the MAA would be premature. Therefore, the Court will not address the issue further at this time.

## ORDER

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that:**

1) Plaintiff's Motion for Preliminary Injunction (Docket No. 10) is Denied.

DATED: February 1, 2010

/s/ Candy W. Dale

Honorable Candy W. Dale
Chief United States Magistrate Judge